[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10851
Non-Argument Calendar

_____

D.C. Docket No. 8:10-cv-00092-EAK-MAP

BURTON W. WIAND,
as Receiver for Valhalla Investment
Partners, L.P., Viking Fund, LLC, Viking
IRA Fund, LLC, Victory Fund, LTD, Victory
IRA Fund, LTD, Scoop Real Estate, L.P.,

Plaintiff - Appellee
Cross Appellant,

versus

DANCING $, LLC,

Defendant - Appellant
Cross Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(August 27, 2014)

Before TJOFLAT, FAY, and ALARCÓN,[*] Circuit Judges.

_____
[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

PER CURIAM:

In this "clawback" action to recover the fraudulent transfer of purported profits made to investors in various hedge funds during the perpetration of a Ponzi scheme,[1] Dancing $, LLC appeals the District Court's grant of summary judgment in favor of Burton W. Wiand (the "Receiver") on his claim under the Florida Uniform Fraudulent Transfer Act ("FUFTA"),[2] Fla. Stat. §§ 726.101–726.210.  In one of many related clawback actions filed separately against numerous defendants, the Receiver sought to void distributions of profits to Dancing $ from the receivership entities—various hedge funds involved in a Ponzi scheme.  The Receiver cross-appeals the District Court's denial of prejudgment interest on the profits the District Court ordered Dancing $ to return to the receivership entities.  Following our recent decision in Wiand v. Lee, 753 F.3d 1194 (11th Cir. 2014), we affirm the District Court's grant of summary judgment in favor of the Receiver and reverse and remand with instructions the District Court's denial of the Receiver's request for prejudgment interest.

---

[1] "'[A] Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors.'"  United States v. Silvestri, 409 F.3d 1311, 1317 n.6 (11th Cir. 2005) (quoting In re Bonham, 229 F.3d 750, 759 n.1 (9th Cir. 2000)).  "The modus operandi of a Ponzi scheme is to use newly invested money to pay off old investors and convince them that they are earning profits rather than losing their shirts."  United States v. Orton, 73 F.3d 331, 332 n.2 (11th Cir. 1996) (quotation marks omitted).

[2] FUFTA, Fla. Stat. §§ 726.101–726.201, is Florida's version of the Uniform Fraudulent Transfer Act (the "UFTA").  The UFTA is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it."  BMG Music v. Martinez, 74 F.3d 87, 89 (5th Cir. 1996).  It has been adopted by the majority of states.

I.

This case stems from the collapse of a large-scale Ponzi scheme orchestrated by hedge fund manager Arthur Nadel over the course of a decade. From 1999 through January 2009, Nadel, through Scoop Capital, LLC and Scoop Management, Inc. (entities that he created and controlled), together with Christopher Moody and Neil Moody, through Valhalla Management, Inc. and Viking Management, LLC, managed hedge funds including Valhalla Investment Partners, L.P.; Viking Fund, LLC; Victory IRA Fund, LLC; Victory Fund, Ltd.; Victory IRA Fund, LTD; and Scoop Real Estate, LP (collectively, the "Hedge Funds"). Throughout this period, Nadel induced investors to open accounts with the Hedge Funds based on misrepresentations as to the funds' assets and as to the returns the investors would receive.

Nadel controlled the Hedge Funds' investments through Scoop Capital and Scoop Management. Although Nadel performed some trading, he primarily used the principal provided by new and existing investors to benefit himself and to pay distributions to earlier investors in order to maintain an appearance of profitability and legitimate investment activity. Ultimately, Nadel maintained more than 700 investor accounts and raised approximately $350 million from investors.

Nadel controlled the Hedge Funds' trading activity as follows. Nadel transferred investors' money into brokerage accounts for the Hedge Funds and to

3

his personal accounts.  He commingled investors' funds from the Hedge Funds among his personal accounts, which he combined into a single master trading account.  From this master account, Nadel purchased securities.  Then, he allocated completed trades between the Hedge Funds' brokerage accounts and his personal accounts, typically allocating profitable trades to himself and unprofitable trades to the Hedge Funds.  Nadel misrepresented the net asset value and net profits of the Hedge Funds through monthly statements issued to investors, which showed fictitious increases in investor accounts.  Investors' funds were used to pay Nadel management and performance-incentive fees based on the inflated performance of the funds shown in the investor statements.

In reality, the Hedge Funds were insolvent as early as 2000 and remained so until January 2009, when the scheme collapsed as a result of the funds' losses and the payment of larger management fees to Nadel.  On January 21, 2009, the Securities and Exchange Commission filed an emergency action against Nadel in the U.S. District Court for the Middle District of Florida.  SEC v. Nadel, No. 8:09-cv-00087-RAL-TBM (M.D. Fla. 2009).  That same day, a Magistrate Judge in the U.S. District Court for Southern District of New York issued a warrant for Nadel's arrest, and eventually a fifteen-count indictment was issued charging Nadel with securities fraud, mail fraud, and wire fraud.  United States v. Nadel, No. 1:09-cr-00433-JGK-1 (S.D.N.Y. 2009).  Nadel pled guilty to all counts.  He was sentenced

to 168 months imprisonment and ordered to pay $174,930,311.07 in restitution. Nadel died in prison on April 16, 2012.

The District Court in the SEC action appointed Burton W. Wiand as the Receiver and charged him with, among other things, recovering fraudulent transfers of money traceable to investors in the Hedge Funds for the benefit of the Hedge Funds and their creditors, including the defrauded investors. Pursuant to this mandate, the Receiver identified investors in Nadel's scheme that received distributions in excess of their principal investment, and demanded return of these "false profits." Many settled pre-suit. The Receiver then filed suit against those benefited investors who refused to settle, including Dancing $.

Dancing $ is a Montana LLC having 136 members. On January 13, 2010, the Receiver sued Dancing $ in the U.S. District Court for the Middle District of Florida. The complaint sought to recover Dancing $'s "false profits" via two claims: (1) avoidance of fraudulent transfers pursuant to FUFTA, under theories of actual fraud,[3] Fla. Stat. § 726.105(1)(a), and constructive fraud,[4] Fla. Stat.

---

[3] Under FUFTA's actual fraud provision, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Fla. Stat. § 726.105(1)(a).

[4] Under FUFTA's constructive fraud provisions, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . [w]as engaged or was

5

§§ 726.105(1)(b) and 726.106(1); and (2) unjust enrichment. Dancing $ invested a total of $675,000 in 2006 and 2007 in Hedge Funds Valhalla Investment Partners and Scoop Real Estate, and received distributions from these funds in 2008 totaling $782,172.11. Thus, the Receiver sought to recover the difference, $107,172.11 in "false profits."

On March 23, 2012, the Receiver filed an omnibus motion for partial summary judgment in this and many of the other substantially similar clawback cases[5] on several key issues: (1) whether Nadel operated the Hedge Funds as a Ponzi scheme from 1999 to January 2009; (2) whether, consequently, every transfer of an asset from a Hedge Fund during that time was made with actual intent to hinder, delay, or defraud creditors of Nadel so as to establish Dancing $'s (and the other clawback defendants') liability for the Receiver's FUFTA claim under Fla. Stat. § 726.105(1)(a); (3) whether each of the Hedge Funds was insolvent from 1999 to January 2009 so as to establish liability under Fla. Stat. §§ 726.105(1)(b) and 726.106(1); and (4) alternatively, whether Nadel's guilty plea

about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or . . . [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due," id. § 726.105(1)(b); or "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation," id. § 726.106(1).

[5] With a few exceptions, the complaints in all of the Receiver's clawback cases are alike in their recitals about Nadel, his conduct, and the Receiver's causes of action. Any differences relate to the peculiarities of a given defendant and the dates and amounts of the distributions made to that defendant.

established that the transfers of assets from the Hedge Funds were made with actual intent to hinder, delay, or defraud Nadel's creditors. On September 28, 2012, the Receiver filed another motion for summary judgment against Dancing $, again seeking to establish liability under FUFTA, or, in the alternative, on the unjust enrichment claim, and also seeking to establish the amount of that liability, a judgment in the amount of $107,172.11, plus prejudgment interest.

On November 29, 2012, the Magistrate Judge issued a report and recommendation ("R & R") on the Receiver's summary judgment motions, which the Magistrate Judge treated as merged for decisional purposes. The R & R recommended that the District Court grant summary judgment for the Receiver on the FUFTA claim based on a finding that Dancing $ had failed to create triable issues of fact on whether a Ponzi scheme controlled by Nadel existed at the time of the distributions to Dancing $, and whether these distributions were therefore avoidable under FUFTA because they were made with the actual intent to defraud creditors. The R & R noted that Dancing $ did not dispute the Receiver's calculations as to the amount of the transfers it had received, and recommended that the District Court award the Receiver a judgment in the amount of $107,172.11. The R & R also recommended denying an award of prejudgment interest to the Receiver on equitable grounds. The R & R did not address the Receiver's alternative unjust enrichment theory.

7

On January 23, 2013, the District Court issued an order adopting the R & R. Wiand v. Dancing $, LLC, 919 F. Supp. 2d 1296 (M.D. Fla. 2013). The District Court granted summary judgment in favor of the Receiver and entered a final judgment in the amount of $107,172.11, denying prejudgment interest. Id. at 1301–02. Dancing $ timely appealed.

## II.

We review the District Court's grant of summary judgment de novo. Ellis v. England, 432 F.3d 1321, 1325 (11th Cir. 2005) (per curiam). We review the District Court's decision to refuse or reduce prejudgment interest for abuse of discretion. Blasland, Bouck & Lee, Inc. v. City of N. Miami, 283 F.3d 1286, 1298 (11th Cir. 2002).

## III.

Under FUFTA's actual fraud provision—the theory upon which Dancing $'s liability hinged—a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Fla. Stat. § 726.105(1)(a). Thus, FUFTA requires "[1] a creditor to be defrauded, [2] a debtor intending fraud, and [3] a conveyance of property which is applicable by law to the payment of the debt due." Johnson v. Dowell, 592 So. 2d

8

1194, 1196 (Fla. 2d Dist. Ct. App. 1992). A "creditor" is "a person who has a claim," Fla. Stat. § 726.102(5), and "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," id. § 726.102(4). The fraudulent transfer must be of an "asset," which is defined as any "property of a debtor," excluding certain narrow exceptions. Id. § 726.102(2). If FUFTA's conditions are satisfied, "a creditor, subject to [certain] limitations[,] may obtain . . . [a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." Id. § 726.108.

Dancing $'s central argument on appeal is that the Receiver may not proceed under FUFTA because the Receiver lacks standing to bring a FUFTA claim and because the transfers Nadel made to investors were not transfers of Nadel's property but rather of the Hedge Funds' property, and FUFTA provides a cause of action only for clawback of a transfer of the debtor's own funds. The Receiver argues on cross-appeal that the District Court erred in denying it prejudgment interest. We held consideration of Dancing $'s appeal and the Receiver's cross-appeal pending our decision in another of the Receiver's clawback actions, Wiand v. Lee, 753 F.3d 1194 (11th Cir. 2014), which raised the same central issues as Dancing $'s case. Lee has now been decided.

9

In <u>Lee</u>, the circumstances and procedural history are substantially the same as in Dancing $'s case.  <u>See</u> 753 F.3d at 1197–99.  The Receiver asserted FUFTA and unjust enrichment claims against Vernon M. Lee individually and as trustee for the Vernon M. Lee Trust (collectively, the "Lee defendants") in the U.S. District Court for the Middle District of Florida to recover the net gains the Lee defendants had reaped from Nadel's scheme—in the Lee defendants' case, a total of $935,631.51—plus prejudgment interest.  <u>Id.</u> at 1199.  The Receiver filed motions for summary judgment that were similar to those filed in this case.  <u>Id.</u>  The Magistrate Judge—the same Magistrate Judge as in Dancing $'s case—issued a report and recommendation proceeding along the same lines as the R & R in this case, finding that during the relevant times Nadel operated the Hedge Funds as a Ponzi scheme and that the distributions to the Lee defendants "were therefore avoidable under FUFTA because they were made with the actual intent to defraud creditors," and recommending summary judgment in favor of the Receiver and denying the Receiver prejudgment interest.  <u>Id.</u>  As here, the District Court adopted the Magistrate Judge's report and recommendation, entered final judgment in favor of the Receiver, and denied prejudgment interest.  <u>Id.</u>

On appeal, the Lee defendants raised essentially the same argument Dancing $ raises here: that the Receiver could not proceed under FUFTA.  <u>Id.</u> at 1202.  We noted that, under FUFTA'a actual fraud provision, Fla. Stat. § 726.105(1)(a)—the

10

theory upon which the Lee defendants' liability hinged—in order to determine whether a transfer was made with actual intent to defraud a creditor, courts generally look for the statutory "badges of fraud." Id. § 726.105(2)(a)–(k). However, we explained, "proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under § 726.105(1)(a) without the need to consider the badges of fraud." Lee, 753 F.3d at 1201. We held that "[t]he Magistrate Judge correctly concluded that the receivership entities' transfers of distributions to Lee as an investor were made in furtherance of a Ponzi scheme,"[6] and thus actual fraudulent intent was established. Lee, 753 F.3d at 1202.

The Lee defendants argued, as Dancing $ does here, that the elements of a FUFTA actual fraud claim were not met because the transfers cannot satisfy the plain language of FUFTA. Id. FUFTA requires a creditor—here, the Hedge Funds in receivership—and a debtor—here, Nadel. To satisfy FUFTA, Nadel's transfers to investors must have been transfers of "property of a debtor." Fla. Stat. § 726.102(2), (7), (11). But the transfers were of the Hedge Fund's funds, not

---

[6] The Magistrate Judge's R & R in this case lays out what the Receiver had to show to demonstrate the existence of a Ponzi scheme: "(1) deposits made by investors; (2) the Receivership Entities conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Receivership Entities produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors." Doc. 121, at 11. In both Lee and this case, the Magistrate Judge found that a detailed report by the Receiver's forensic accountant, together with Nadel's admissions, plea agreement, testimony at his plea and sentencing hearings, and criminal judgment provided "overwhelming evidence" of a Ponzi scheme, and noted that Dancing $, like the defendants in Lee, "offer[ed] little rebuttal evidence in admissible form." Id. at 25.

Nadel's. "In other words, applying FUFTA to Nadel's transfers appears to treat the receivership entities and Nadel as simultaneously both separate and distinct entities—the receivership entities are considered distinct from Nadel in order to establish a creditor and a debtor, but they are treated as one entity in order to establish that Nadel's transfers of the entities' funds were transfers of his property." Lee, 753 F.3d at 1202.

We found this argument unpersuasive, following the reasoning of Judge Posner in Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995), which we described as "the leading case on this issue":

> Although the corporations constitute the "robotic tools" used by the Ponzi operator, they are "nevertheless in the eyes of the law separate legal entities with rights and duties." The money they receive from investors should be used for their stated purpose of investing in securities, and thus the corporations are harmed when assets are transferred for an unauthorized purpose to the detriment of the defrauded investors, who are tort creditors of the corporations. Although the corporations participate in the fraudulent transfers, once the Ponzi schemer is removed and the receiver is appointed, the receivership entities are no more the "evil zombies" of the Ponzi operator but are "[f]reed from his spell" and become entitled to the return of the money diverted for unauthorized purposes. Under Lehmann, the Receiver has standing to sue on behalf of the receivership entities because they were harmed by Nadel when he transferred profits to investors . . . from the principal investments of others for the unauthorized purpose of continuing the Ponzi scheme. . . . Applying Lehmann to FUFTA, the receivership entities became "creditors" of Nadel at the time he made the transfers of profits to Lee and others because, as FUFTA requires, they had a "claim" against Nadel. They had a "claim" against Nadel because he harmed the corporations by transferring assets rightfully belonging to the corporations and their investors in breach of his fiduciary duties,

and a "claim" under FUFTA includes "any right to payment" including a contingent, legal, or equitable right to payment. The receivership entities were thus creditors because they had a right to a return of the funds Nadel transferred for unauthorized purposes for the benefit of their innocent investors. The Receiver's claim thus fits within the statutory language of FUFTA, which requires the existence of a creditor and a debtor.

Lee, 753 F.3d at 1202–03 (footnote omitted) (citations omitted).

We further found that "with each transfer, Nadel diverted property that he controlled and that could have been applicable to the debt due, namely, the very funds being transferred." Id. at 1203. Thus, we held that "the Receiver has demonstrated every element Florida courts require under FUFTA." Id. Accordingly, we affirmed the District Court's grant of summary judgment to the Receiver. Id. at 1197.

We must follow Lee and affirm the District Court's grant of summary judgment to the Receiver in Dancing $'s case as well. The circumstances here are the same as in Lee except for which of the Hedge Funds was involved and the amount and dates of the transfers. Dancing $ raises several additional arguments, some which address these differences. None are persuasive, and only a few merit serious consideration.

First, Dancing $ makes several arguments which are either settled or mooted by our opinion in Lee. Dancing $ argues that genuine issues of material fact remains as to whether the Hedge Funds in which Dancing $ invested—Valhalla

13

Investment Partners and Scoop Real Estate—were alter egos of Nadel.  This argument is foreclosed by <u>Lee</u>, in which we voided transfers to the Lee defendants from both Valhalla Investment Partners and Scoop Real Estate, among other of the Hedge Funds.  <u>See</u> <u>id.</u> at 1198.  Dancing $ also argues that genuine issues of material fact remain as to whether Nadel's guilty plea establishes the requisite intent under FUFTA.  But our finding in <u>Lee</u> that the intent requirement was met forecloses this argument as well.  <u>See</u> <u>id.</u> at 1201–02.

Dancing $ argues that issues of material fact remain as to whether Nadel operated a Ponzi scheme as to Valhalla Investment Partners and Scoop Real Estate (the Hedge Funds in which Dancing $ invested), because the Receiver's expert improperly analyzed the Hedge Funds as a group, and because these two funds were allegedly actually making a profit in certain years.  Dancing $ also argues that none of the evidence establishes the existence of a Ponzi scheme as a matter of law.  However, we held in <u>Lee</u> that Nadel operated all the Hedge Funds as a Ponzi scheme, and that he commingled invested assets and did not distinguish among the Hedge Funds when he traded.  <u>Id.</u> at 1198, 1201–02.  Given this arrangement, it is not surprising that some of the funds might at times turn a profit.  Thus, Nadel's Ponzi scheme involved all the Hedge Funds, including Valhalla Investment Partners and Scoop Real Estate, and it is appropriate to treat them as a group.  Moreover, the scheme was in operation in 2008, when Dancing $ received its

14

transfers.  Id. at 1202.  Thus, "[t]he magistrate judge correctly concluded that the receivership entities' transfers of distributions to [Dancing $] as an investor were made in furtherance of a Ponzi scheme."  Id.

Finally, Dancing $ argues that issues of material fact remain as to the amount that the Receiver is entitled to recover from it.  The Receiver has not offered evidence concerning the amount of management fees paid to Nadel by Valhalla Investment Partners and Scoop Real Estate specifically, which, Dancing $ argues, constitutes the amount of its claim against Nadel in this case.  Because a receiver is only entitled to avoid so much of a transfer as is necessary to satisfy the amount of its claim, Dancing $ contends, this amount must be established before a judgment may be imposed.  However, Dancing $ did not raise this argument in the District Court.  Thus, the argument is waived.  See Formby v. Farmers & Merchs. Bank, 904 F.2d 627, 634 (11th Cir. 1990) ("As a general rule, an appellate court will not consider a legal issue or theory raised for the first time on appeal." (internal quotation marks and citations omitted)).

Accordingly, we find that the District Court did not err in granting summary judgment for the Receiver and imposing a judgment of damages in the amount of $107,172.11.[7]

---

[7] Dancing $ raises a handful of additional arguments, none of which merit extensive discussion.  First, Dancing $ argues that, because Valhalla Investment Partners and Scoop Real Estate were organized as limited partnerships in which Dancing $ was a limited partner, the law

With regard to the Receiver's argument on cross-appeal that the District Court abused its discretion in denying an award of prejudgment interest, Lee also decides the matter. Under the "loss theory" of prejudgment interest, which applies under Florida law, "prejudgment interest is 'merely another element of pecuniary damages,'" Lee, 753 F.3d at 1204 (quoting Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 214 (Fla. 1985), but may be withheld "'when its exaction would be inequitable,'" id. (quoting Flack v. Graham, 461 So. 2d 82, 84 (Fla. 1984)). In determining whether to award prejudgment interest or to reduce the amount of prejudgment interest awarded, a court must consider three factors:

> (1) in matters concerning government entities, whether it would be equitable to put the burden of paying interest on the public in choosing between innocent victims; (2) whether it is equitable to

---

of partnership immunizes Dancing $ from liability under FUFTA because limited partners are not liable to a creditor of the general partner. We reject this form-over-substance argument. An instrument, such as a limited partnership agreement, drawn up in the perpetration of a fraudulent scheme cannot protect the actors in that scheme from liability.

Dancing $ also argues that issues of material fact remain as to whether Valhalla Investment Partners and Scoop Real Estate received reasonably equivalent value for the transfer to Dancing $ and whether Nadel (as the transferor) was insolvent in 2008. These arguments go to the requirements for establishing constructive fraud under FUFTA, Fla. Stat. §§ 726.105(1)(b), 726.106(1), and are thus irrelevant in light of the District Court's finding of liability under FUFTA's actual fraud provision, id. § 726.105(1)(a).

Finally, Dancing $ argues that issues of material fact remain as to its affirmative set-off defense. Dancing $ argues it should be able to offset any judgment in the Receiver's favor against losses Dancing $'s members suffered by reinvesting in the Hedge Funds through a third entity, Elendow. This argument also lacks merit. As the District Court correctly held, the "'basis for set-off is mutuality of claims' . . . . Elendow's debt claim is not Dancing $'s claim, notwithstanding their overlapping memberships." Wiand v. Dancing $, LLC, 919 F. Supp. 2d 1296, 1317–18 (M.D. Fla. 2013) (internal quotation marks omitted) (quoting Everglade Cypress Co. v. Tunnicliffe, 107 Fla. 675, 148 So. 192, 193 (1933)).

16

allow an award of prejudgment interest when the delay between injury and judgment is the fault of the prevailing party; (3) whether it is equitable to award prejudgment interest to a party who could have, but failed to, mitigate its damages.

Id. (citing Blasland, 283 F.3d at 1297).

In Lee, the Magistrate Judge in the report and recommendation adopted by the District Court "stated that Florida law considers prejudgment interest an element of pecuniary damages and stated the equitable factors in Blasland that would warrant a court in departing from the general rule that prejudgment interest is to be awarded." Id. at 1204. But the rationale the Magistrate Judge set out "fail[ed] to identify and apply the equitable factors considered in Blasland to the decision to deny prejudgment interest" and thus committed an abuse of discretion. Id. at 1205. We noted several cases indicating that Florida courts award prejudgment interest "as a matter of course." Id. (citing Willis v. Red Reef, Inc., 921 So. 2d 681, 684–85 (Fla. 4th Dist. Ct. App. 2006) (remanding with instructions to the trial court to calculate prejudgment interest due on damages awarded for a FUFTA claim); Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc., 889 So. 2d 180, 199 (Fla. 2d Dist. Ct. App. 2004) (reversing the trial court for failure to award prejudgment interest on an unjust enrichment award); Mansolillo v. Parties by Lynn, Inc., 753 So. 2d 637, 640 (Fla. 3d Dist. Ct. App. 2000) (stating that, on a FUFTA claim, "[o]nce the loss is fixed as of [a] specific date, prejudgment interest is to be added to that amount."); Burr v. Norris, 667 So. 2d 424, 426 (Fla. 2d Dist.

17

Ct. App. 1996) (reversing and remanding with instructions to the trial court to award prejudgment interest on an unjust enrichment award)).  Accordingly, we reversed the District Court's judgment denying prejudgment interest and instructed that, "[u]pon remand, the magistrate judge must cite specific equitable considerations recognized under Florida law that would result in a different outcome than the cases" that routinely award prejudgment interest on FUFTA and unjust enrichment claims.  Id.

Here, the Magistrate Judge's R & R, which the District Court adopted, recommends denying prejudgment interest in virtually identical language to that the Magistrate Judge used in recommending a denial of prejudgment interest in Lee—only the defendants' names differ.  Thus, following Lee, we must reverse the District Court's judgment denying prejudgment interest and remand.  Upon remand, the District Court must identify and apply the equitable factors set forth in Blasland in order to explain why a denial of prejudgment interest is warranted in light of cases which indicate that Florida courts award it routinely.

## IV.

Accordingly, we AFFIRM the District Court's order granting summary judgment in favor of the Receiver and REVERSE and REMAND the denial of prejudgment interest with instructions that the District Court identify and apply the Blasland factors in order to determine whether equitable considerations justify a

denial or reduction of prejudgment interest to the Receiver in light of Florida's general rule that prejudgment interest is an element of pecuniary damages.

SO ORDERED.